**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor,**

v.

**VALCO, INC., a Corporation, d/b/a Rio Loan Company.**

**Civ. A. No. 67-B-31.**

United States District Court
S. D. Texas,
Brownsville Division.

Feb. 23, 1968.

Charles Donahue, Sol., U. S. Dept. of Labor, Washington, D. C., and M. J. Parmenter, Regional Atty., and James F. Gruben, Trial Atty., U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

Fred Galindo, Brownsville, Tex., for defendant.

## MEMORANDUM OPINION

GARZA, District Judge.

This case was brought by the Secretary of Labor, United States Department of Labor, asking the Court to enjoin the Defendant from violating the minimum wage, overtime and record keeping requirements of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201

5. Hercules Casualty Ins. Co. v. Preferred Risk Ins. Co., 337 F.2d 1 (10 Cir. 1964) is in accord.

et seq.; and to enjoin the Defendant from withholding any minimum wages or overtime compensation found by the Court to be due under the Act.

The case was tried before the Court on January 23, 1968, and oral testimony was taken, exhibits received, and the pretrial stipulations of the parties introduced. The parties were allowed to file briefs, and those are now before the Court.

Jurisdiction of the Court over the subject-matter and the parties is not in dispute.

The Defendant, Valco, Inc. No. 2, d/b/a Rio Loan Company, is a corporation incorporated under the laws of the State of Texas. It has a permit from the State of Texas to make loans in an amount not to exceed $100.00. It is a rather small operation and has regularly in its employ a manager not subject to the Fair Labor Standards Act under any circumstances, a secretary and two collectors.

The Defendant only makes loans to customers residing in the Brownsville, Texas, area. However, it was sometimes discovered that the customer actually resided in Mexico or in some State outside of Texas. This resulted either from the customer having moved after the loan was made, or from having misrepresented his correct address or residence. At the time of trial, the number of such accounts was 22 out of 717 outstanding accounts, but there was evidence that at some time previous there had been up to about forty of such accounts. The Defendant Loan Company only maintains its Brownsville office, and did not refer these accounts to anyone else. It attempted to make collection from a customer that lived outside of Brownsville through the mailing of letters. The manager always prepared these in longhand, but the secretary in the office typed them and mailed them.

The secretary performed the usual secretarial duties, including the handling of mail, answering the telephone, and preparing certain reports. The secretary at times answered long-distance calls, but the calls were always handled by the manager.

The collectors pick up cards in the office that show the name and last known address of persons who have accounts with the Defendant. They make collections on these accounts, make arrangements for payment, and attempt to locate the persons who have moved from their last known address. The money collected is turned over to the office, together with whatever information that has been obtained about the customer that may be useful to the Defendant. It is the collectors who discover that some of the customers are not actually residing in the Brownsville area. The collectors make their reports to the office, either by personal contact or by telephone.

At first blush it would seem that the Defendant is only a small loan company doing no interstate business and, therefore, not engaged in commerce or in producing goods for commerce. However, the Defendant operates with funds made available to it by Southern Funds, Inc., of Nashville, Tennessee. The Defendant has a permanent financing arrangement by contract with Southern Funds, Inc.

The contract (called a Revolving Loan Agreement) was introduced into evidence. The Defendant accepts promissory notes from its customers, endorses them to Southern Funds, Inc., at Nashville, Tennessee. Full payment of the note, when it is made, is reflected in one or more of the reports prepared by the Defendant and sent to Southern Funds, Inc. Southern Funds then returns the note by mail to the Defendant's office, where it is conveyed to the original maker, usually by mail. These notes serve as collateral on a continuing basis for the money owed by the Defendant to Southern Funds, Inc.

The Original obligation to Southern Funds, Inc., was incurred on May 11, 1964, in the amount of $28,000.00. As of March 31, 1966, the Defendant owed Southern Funds about $38,000.00. Defendant has continued to owe Southern

Funds a substantial amount of money throughout the period in question, and there is no question but that the money made available for loans by the Defendant has come from Southern Funds. A further obligation in the amount of $11,-700.00 was also incurred by the Defendant to Southern Funds on June 30, 1966, which is evidenced by a promissory note of the Defendant and secured by notes receivable from the Defendant's customers in the approximate amount of $56,000.00.

Under the Revolving Loan Agreement in question, the Defendant regularly prepares eight separate reports which are sent directly to Southern Funds, Inc. These reports contain in detail the financial transactions of the Defendant and the Defendant's customers. Five of these reports were prepared and sent to Southern Funds three times a week; one every ten days; and two of these reports were sent once a month. The manager, Joe Cortez, testified that he prepared these reports, but the fact remains that they were typed by the secretary, and much of the information in the reports came from the work done by the collectors. There was testimony that the preparation of most, if not all, of the reports in question was required under the laws of Texas, but the fact remains that the reports were also prepared for transmission to Southern Funds, Inc., in Tennessee.

The Defendant urges that the Plaintiff has failed to meet its burden of proof that the Defendant's employees were engaged in commerce or in the production of goods for commerce within the meaning of the Act.

However, there is no question but that Defendant's employees were engaged in commerce. The Fair Labor Standards Act defines commerce to mean trade, commerce, transportation, transmission or communication among the several States, or between any State and any place outside thereof. 29 U.S.C. § 203(b).

The Act has been construed liberally to apply to the farthest reaches consistent with congressional direction. Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Mitchell v. C. W. Vollmer & Co., Inc., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196; Alstate Construction Co. v. Durkin, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745.

The Defendant further urges on the Court that those transactions with Southern Funds should not subject it to the Act, for to do so would be to penalize it for having to borrow money from outside of Texas; and says that the cases of Mitchell v. Kentucky Finance Co., Inc., 150 F.Supp. 368, 254 F.2d 8, 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 and Aetna Finance Co. v. Mitchell, 247 F.2d 190 (CA 1, 1957), which are urged on the Court by the Plaintiff, are not controlling.

In these two cases local branch offices were engaged in the loan business, but both were controlled by parent companies outside the State. They were naturally larger operations than the operation of the Defendant here, but the local employees in these cases were performing substantially the same duties as the employees of our Defendant.

Southern Funds, Inc., it is true, has no control over or interest in the Defendant other than the Revolving Loan Agreement above referred to; but as far as the transactions involved are concerned, I can see no difference between the parent companies in *Kentucky Finance* and *Aetna,* supra, and Southern Funds in our case.

The employees of the Defendant Rio Loan Company, in assembling information, collecting money, preparing reports destined for out of State, preparing and sending money in payment, and handling and endorsing negotiable instruments to points outside the State, and handling and processing interstate mail constitutes being engaged in commerce within the meaning of the Act.

The Defendant urges on the Court the case of Mitchell v. Household Finance Corporation, 208 F.2d 667 (CA 3, 1953).

Subsequent cases in other Circuits have cast doubt on this case, and rightly so; and I do not consider it as good authority at present.

The secretary employed by this Defendant is covered under the authority of *Wirtz v. Wohl Shoe Co.*, 382 F.2d 848 (CA 5, 1967), in which this Court was reversed by the appellate court.

The collectors employed by the Defendant are covered because their work is directly and vitally related to the interstate activity in such a way that their work is a part of the interstate activity of the Defendant. Without the information that they obtain, the reports that have to be sent to Southern Funds could not be prepared.

The Defendant's employees were not only engaged in commerce, but were engaged in producing goods for commerce. Without the receipt of funds from Southern Funds and the continued making of the reports required under its contract with the Defendant, the Defendant Rio Loan Company could not exist.

As stated by Judge Dyer:

"It would seem that the statutory definition of 'goods' and 'produced' is broad enough to include the preparation of reports, bills, statements, business papers, etc."—*Wirtz v. Credit Service, Inc.* (D.C.Fla.1964) 16 WH Cases 755; 51 L.C. ¶ 31658 (affirmed (CA–5, 1967) 372 F.2d 143.)

The secretary and the collectors, therefore, are engaged in the production of goods for commerce and in a process or occupation closely related and directly essential to the production of such goods. *Public Building Authority of Birmingham v. Goldberg*, 298 F.2d 367 (CA 5, 1962).

Because of personnel turn-over, several employees have been employed as secretaries and as collectors during the period in question. The evidence shows that present employees and former employees of the Defendant were not properly paid under the minimum wage and overtime requirements of the Act.

Representatives of the Wage and Hour Division of the Department of Labor contacted the President of the Defendant, but Defendant has refused to maintain records of the hours worked by its employees, or to pay its employees as required by the Act, on the ground that the Fair Labor Standards Act was not applicable to the operations of the Defendant.

From the evidence before me, I find that the following schedule sets out the name of each employee involved in this action and the amount each employee is entitled to recover under the Act:

| Employee | Period | Amount Due |
|---|---|---|
| Santiago Calderon | 4/15/65 to 5/31/65 | $ 102.66 |
| Dolores Florence | 4/15/65 to 7/ 7/65 | 145.53 |
| Maris B. Flores | 11/66 to 5/31/67 | 470.44 |
| Gerardo E. Gonzalez | 12/25/64 to 3/15/65 | 188.21 |
| Irma Gutierrez | 6/67 to 1/15/68 | 299.97 |
| Manuel Ortiz | 10/ 7/65 to 11/30/65 | 100.00 |
| Anita Ruiz Vega | 7/15/65 to 8/31/65 | 92.61 |
| Eleazar Salinas | 11/20/65 to 4/30/66 | 275.00 |
| Jose Angel Solis, Jr. | 1/ 1/66 to 3/ 1/66 <br> 3/ 1/66 to 6/30/67 | 1,017.26 |
| Armando Silva | 5/15/66 to 10/15/66 | 283.19 |
| Felipe Trevino | 3/15/65 to 8/31/65 | 184.00 |
| Ema Unayan | 2/67 to 7/67 | 240.64 |
| Rachael Villalongin Aldridge | 8/15/64 to 4/15/65 | 460.16 |
| Margarita Zepeda | 9/ 9/65 to 2/28/66 <br> 3/ 1/66 to 2/67 | 622.97 |
| | | $4,482.64 |

The Plaintiff is entitled to an injunction enjoining and restraining the further withholding of the amounts found to be due the Defendant's employees.

Finding that the Defendant is in violation of Sections 215(a) (2) and 215(a) (5) of the Fair Labor Standards Act, the Plaintiff is entitled to an injunction against further violations of the same by the Defendant. 29 U.S.C. § 217.

These constitute the Findings of Fact and Conclusions of Law of the Court, and a judgment in accordance with the same is this day being entered.

The Clerk will send to counsel for the parties a copy of this Memorandum and a copy of the Judgment being this day entered.